**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION**

In re:                                          )
                                                )
PHILLIPS BROTHERS MACHINE                       )      Case No.  15-10870
COMPANY, INC                                    )
                                                )      Chapter 11
        Debtor-In-Possession                    )

_____

**DEBTOR'S NOTICE OF SALE AND EXPEDITED MOTION FOR ORDER (A)
AUTHORIZING SALE OF SUBSTANTIALLY ALL ESTATE ASSETS FREE AND
CLEAR OF LIENS, CLAIMS, RIGHTS, INTERESTS AND ENCUMBRANCES; (B)
APPROVING STALKING HORSE PROTECTIONS AND PROCEDURES, AND (C)
AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES**

_____
### NOTICE OF HEARING

Notice is hereby given that:

A hearing will be held April 8, 2015, at 1:30 p.m. in the Historic U.S. Courthouse, Courtroom A,
31 East 11th Street, Chattanooga, TN 37402, on the following:

Debtor's Notice of Sale and Expedited Motion for Order (A) Authorizing Sale of Substantially
all Estate Assets Free and Clear of Liens, Claims, Rights, Interests and Encumbrances; (B)
Approving Stalking Horse Protections and Procedures; and (C) Authorizing Assumption and
Assignment of Executory Contracts and Unexpired Leases.

A final hearing will be set by the Court on the hearing date noted above.  If you do not want the
court to grant the relief requested, you or your attorney must attend this hearing.  If you do not
attend the hearing, the court may decide that you do not oppose the relief sought in the Motion
and may enter an order granting that relief.

_____

        Pursuant to 11 U.S.C.A. §§ 105, 363 and 365 and Fed. R. Bankr. P. 6004 and 6006, Phillips

Brothers Machine Company, Inc.,  ("Debtor" or "Debtor-In-Possession"), moves this Court for an

order  (A) authorizing the sale of substantially all the estate's assets free and clear of liens, claims,

rights, interests and encumbrances;  (B) approving the stalking horse bid and protections, and

establishing bidding and auction procedures as necessary, and (C) authorizing the assumption and

assignment of specified executory contracts and unexpired leases in connection with such sale (the "Sale Motion"). In support of the Sale Motion, Debtor states:

### JURISDICTION

1.      On March 4, 2015, (the "Petition Date"), Debtor, Phillips Brothers Machine Company, Inc., ("Phillips Brothers") commenced this reorganization case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code 11 U.S.C.A. §§ 101 to 1532 (the "Bankruptcy Code").

2.      It continues in possession of its respective properties and is operating and managing its business as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      This court has jurisdiction to consider the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.

4.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (N) and (O).

5.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1404 and 1409.

6.      The statutory basis for the relief requested herein is 11 U.S.C. §§ 363(b) and (f), and 365(a), (b), (f) and (k), and Rules 2002(a)(2) and 6004(a), (b), (c) and (e), 6006(a) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### BACKGROUND

7.      Debtor is a Georgia corporation with its principal place of business at 1198 Shattuck Industrial Boulevard, LaFayette, GA 30728.

8.      Debtor employs approximately 92 full and part-time employees at its Lafayette facility and has annual sales of approximately $9,000,000.00.

## DECISION TO FILE BANKRUPTCY AND OBJECTIVES IN BANKRUPTCY; DEBT AND EQUITY OWNERSHIP, SECURED CREDITOR

9.      Prior to the Petition Date, Debtor had approximately $1,000,000.00 in secured debt.

10.      While the Debtor is a high quality and reputable manufacturing company with more than 40 years of continuous operation and a viable business plan, it is suffering severe financial distress.

11.      Phillips Brothers has taken steps to reduce its costs and increase its sales, but to date and for the foreseeable future, these steps have been insufficient to stop its losses.

12.      Phillips Brothers projected a loss for 2015 based upon current operations, and accordingly determined that it needed additional cash from investors or loans.

13.      Post-petition, Debtor's secured creditor was Cornerstone Bank through use of cash collateral.  Cornerstone Bank is secured by Debtor's assets, including the following:

> Inventory;
> Vehicles;
> Equipment;
> Accounts Receivable; and
> Duke Street Trust, LLC has now taken an assignment of the position
> of Cornerstone Bank as secured creditor.

14.      A creditors committee has been appointed pursuant to § 1102 of the Bankruptcy Code.

15.    The proposed purchaser is only willing to purchase the assets of the Debtor through a §363 sale through the Bankruptcy Court.

16.    The objective of this Chapter 11 case is to preserve the Debtor's business as a going concern to allow for the proposed sale. The Debtor seeks to avoid deterioration in asset values, preserve the jobs of employees, and to continue to serve as a viable customer for its trade vendors and supplier to its customers.

## PROPOSED SALE OF ASSETS

17.    On February 25, 2015, Debtor received an offer for substantially all the assets of its business (the "Business") from Phillips Consolidated, LLC ("Buyer"), and subsequently entered into a Term Sheet.  The Debtor and Buyer have agreed on certain changes to the Term Sheet.  The Term Sheet, as changed, provides for a $1,075,000.00 purchase price which Debtor believes to be the fair market value of the Business and its Assets. Authorized representatives of the Buyer negotiated with the Debtor at arms-length and reached an agreement to purchase the Business in exchange for $1,075,000.00 million to be paid in cash at closing.

18.    Debtor executed an Asset Purchase Agreement on April 2, 2015 reflecting this agreement and describing the specific terms and conditions of the sale (the "Asset Purchase Agreement").  The Asset Purchase Agreement is attached hereto as Exhibit A.

19.    To date, Debtor has received no other offers for the Business.

20.    Debtor requests that this court order the sale of the Business and Assets free and clear of liens and encumbrances pursuant to 11 U.S.C.A. § 363(f), with all liens and encumbrances to attach to the net proceeds of the sale.

4

21.     The sale of the Business to Buyer is in the best interests of the estate. The purchase price and sale terms for the Business were negotiated in an arms-length transaction. Debtor believes that the purchase price reflects the fair market value of the Business.

22.     After due deliberation, the Debtor has determined that the sale contemplated herein is in the best interests of the estates and the creditors.

23.     The Debtor believes that the sale of its assets under § 363 of the Bankruptcy Code will best serve the constituencies in this case. At this time, it is unlikely the Debtor has the ability to operate for the period of time that it would take to propose and seek confirmation of a plan of reorganization.  A going concern sale to a financially stable Buyer, pursuant to Bankruptcy Code § 363, will enable the Debtor's business to continue to operate, and will maximize the value of Business to the estate. This is, in the Debtor's view, the only practical way to avoid a piecemeal liquidation.

24.     Buyer understands that its offer will be subject to higher and better bids, and that, at the end of the auction process, the Debtor may select the highest and best bidder to present to the court for approval.

25.      Buyer has requested, and Debtor has agreed to pay to Buyer, an Expense Reimbursement, if a higher bidder is accepted in lieu of Buyer, as described below.

26.     Nonetheless, the Debtor notes that the § 363 bidding process (combined with relief under § 1113 of the Bankruptcy Code) may generate some interest among competing bidders.

## **TERMS OF THE SALE**

27.     Assets.  Buyer will purchase substantially all of the assets of the Debtor located at
or relating to the Business.  The Business will include without limitation (i) equipment, furniture
and fixtures, including bulk systems and assembly and production lines, (iii) inventory  and
supplies, (iv) trademarks, trade names (including Phillips Brothers), brands, formulas, recipes and
other intellectual property, and (v) customer lists, asset schedules, and all other books, records and
information relating to the Business, but not including accounts receivable or cash.

28.     Transfer Free of All Liens and Liabilities to Seller.  The Business will be transferred
free and clear of all liens, claims, encumbrances and interests of any other person or entity.  Liens,
claims, encumbrances and interests shall attach to the sale proceeds.  Buyer will not assume any
liabilities or obligations of or relating to the Debtor or the Business, including without limitation
liabilities relating to products, employees, or environmental matters.

29.     Purchase Price and Closing.  The purchase price will be $1,075,000.00, to be paid
in cash at closing and subject to no financing condition.  Closing will occur no later than May 15,
2015, at a location agreed to by the Buyer and the Debtor.

30.     Conditions.  Conditions to closing will include:  (1) the Business being sold to
Buyer pursuant to an order entered by the Court, under 11 U.S.C. § 363 at the Sale Hearing; (2)
all necessary consents and approvals from third parties must be obtained; (3) parties must execute
a definitive asset purchase agreement containing customary representations and covenants for a
transaction of this type, in substantially the form of the Asset Purchase Agreement attached; (4)
the absence of any litigation with respect to the Business or challenging the transaction (or an order

transferring the Business free and clear of such litigation or challenges); and (7) the absence of any material adverse change with respect to the Business.

31.     Expenses.  Each party will bear its own expenses related to the transaction.

32.     Marketing the Business.  Prior to closing, Debtor may enter into negotiations with respect to the sale of the Business with, or seek or solicit the sale of the Business to, any person or entity other than Buyer.  Notice of the sale of the Business has been served upon all creditors and parties who have expressed an interest in the Business.  Parties who have responded or may respond to the notice have been or shall be advised by the Debtor that they may present higher and better bids, but that they may not be considered.

33.     Due Diligence.  Buyer shall have the right to conduct such due diligence as Buyer deems necessary.  Buyer shall be provided access to (i) the real property, (ii) to all records, documents and information relating to the Business, and (iii) Debtor's personnel and representatives.

**PROPOSED STALKING HORSE BIDDER PROTECTIONS**

34.     The Debtor is also requesting approval of the provision of the Asset Purchase Agreement regarding the payment of the Expense Reimbursement of $75,000.00.

35.     The Expense Reimbursement Fee is to be paid from the proceeds of the sale of the Business and Assets to a Successful Bidder at the Auction, other than the Buyer, upon closing of a competing bid.  In the event that the Expense Reimbursement Fee becomes payable under the terms of the Purchase Agreement, it shall be entitled to superpriority administrative expense priority and allowance as a claim against the Debtor's estate under sections 364(c)(1) and 503(b)

of the Bankruptcy Code for the amount of the Expense Reimbursement Fee with priority over any and all administrative expense claims.  The Buyer required the inclusion of this provision in the Asset Purchase Agreement to be willing to serve as a stalking horse bidder.

### PROPOSED BIDDING PROCEDURES

36.     Although, as noted above, thus far Buyer is the only entity that has been willing to make a proposal to purchase the Debtor's assets, the Debtor believes, consistent with its fiduciary duty to maximize the value of its estate, that it is appropriate to establish procedures for the submission of competing purchase proposals, in order to enable the "market to speak" as to what the value of the Debtor's assets is, and whether in fact the Buyer proposal represents the highest and best offer available to the estate. The Debtor's primary objectives in proposing procedures for the solicitation and consideration of competing bids and the selection of the highest and best bid are: (a) to allow an appropriate opportunity for prospective competing bidders to make a bid, (b) to establish clear rules for bidding, (c) to treat Buyer, as the "stalking horse" bidder, fairly but without discouraging competing bidders, (d) to enable the Debtor (and the court) to easily compare one bid to another, (e) to assure that all bidders have the financial ability to complete the transaction if they are selected and are committed to doing so, and (f) to complete the process in a timely fashion, before the Debtor runs out of cash.

37.     With these objectives in mind, the Debtor proposes the following bid procedures, which are similar to procedures approved by this and other bankruptcy courts throughout the country.

1.    Buyer's Initial Bid:          Buyer or its designee (referred to for convenience herein as "Buyer") has made an initial bid of $1,075,000.00 million (the "Purchase Price") for substantially all of the assets of the Debtor, as designated by Buyer in the Asset Purchase Agreement, on the terms and

conditions set forth in the Asset Purchase Agreement submitted by Buyer (the "Initial Bid"). The Initial Bid shall be subject to higher and better bids on the terms set forth herein.

| 2. | Requirements for Competing Bids: | The requirements set forth in subsections (a) through (h) below for any competing bid are referred to collectively as the "Competing Bid Requirements." |
|---|---|---|
| (a) | Procedures for Submission of Competing Bids: | Any proposal for an Alternative Transaction (as hereinafter defined) ("Competing Bid") must be submitted to counsel for Debtor: Jerrold D. Farinash, Farinash & Hayduk, 100 W ML King Blvd., Suite 816, Chattanooga, TN 37402 jdf@fandhlawfirm.com, with a copy to counsel for Buyer: Cara Alday, Patrick, Beard, Schulman & Jacoway, 537 Market Street, Suite 202, Chattanooga, TN 37402 calday@pbsjlaw.com such that such Competing Bid is received by no later than May 5, 2015, at 11:00 a.m. ("Bid Deadline"). |
| (b) | Required Documentation: | A Competing Bid must be in writing and be accompanied by a blackline version of the Asset Purchase Agreement showing all changes to the Asset Purchase Agreement required by the prospective Buyer. |
| (c) | Deposit: | Any competing bids (each a "**Qualified Bid**") (i) must equal or exceed the sum of the Purchase Price and the minimum Expense Reimbursement Fee, plus $100,000.00 in the first instance (the "**Initial Overbid**"); (ii) must provide for other terms and conditions that shall be the same or more favorable to Seller than the terms of this Agreement; (iii) must be accompanied by a cash deposit of ten percent (10%) of the Initial Overbid, all of which shall be refundable to an unsuccessful bidder; (iv) must be for cash and not subject to any financing contingencies; (v) must be from a bidder who is reasonably likely to obtain the necessary Governmental Authorizations to operate the Business; and (vi) must be accompanied by the affidavit of such competing bidder or such competing bidder's Chief Financial Officer, or similar officer, that such competing bid is for cash and is not subject to any financing contingencies and which affidavit must attach (A) written evidence showing that the competing bidder has available cash or (B) a signed, non-revocable borrowing commitment from a reputable financial institution in each instance totaling not less than the relevant Initial Overbid and any subsequent incremental increases to such Initial Overbid, the Expense Reimbursement Fee and the payment in full of all amounts owed under the DIP Facility. Debtor's counsel or its designee shall hold in escrow each such deposit and shall apply it to the purchase price at closing, if such Competing Bid is the Prevailing Bid (as hereinafter defined) and shall otherwise be refunded to the bidder, unless such bidder is the Prevailing Bidder (as hereinafter defined) but |

subsequently fails to close under its proposed purchase agreement other than because of a breach by Debtor or failure to occur of a closing condition specified in such purchase agreement, in which case the deposit shall be retained by Debtor as damages, without prejudice to Debtor's right to seek any additional damages to which it may be entitled.

(d) Evidence of Capacity to Consummate:

A Competing Bid must include credible evidence, in a form satisfactory to Debtor, of the prospective Buyer's capacity to consummate the purchase contemplated by the Competing Bid within the time frame established by the Bid Procedures at the bid price, and to perform under the Assigned Contracts and Leases (as defined in the Asset Purchase Agreement).

(e) Assets to be Purchased:

A Competing Bid must be a bid for all of the Purchased Assets, and must include a commitment to assume the "Assigned Contracts and Leases" (as defined in the Asset Purchase Agreement) and to perform under such contracts and leases.

(f) Cash Bids Only:

A Competing Bid must provide for an all cash purchase price.

(g) No Closing Conditions:

A Competing Bid shall not be subject to any closing conditions other than those set forth in the Asset Purchase Agreement.

(h) Minimum Overbid Margin:

Each Competing Bid must be for at least $100,000.00 more than the purchase price plus the Expense Reimbursement contemplated in the Asset Purchase Agreement or the last Bid received.   At the Auction, participants (including the Buyer) will be permitted to increase their bids.  Bidding on the Business and Assets will start at the purchase price plus Expense Reimbursement and terms proposed by Buyer, and will proceed thereafter in increments of $100,000.00 (the "Minimum Overbid).

3.   Auction Procedures

Qualified Competing Bid:

A Competing Bid submitted by the Bid Deadline that meets all of the Competing Bid Requirements shall be referred to as a "Qualified Competing Bid."

Time and Place of Auction:

If one or more Qualified Competing Bids are submitted, then an auction shall be conducted at the offices of Farinash & Hayduk, 100 W ML King Blvd., Suite 816, Chattanooga, TN 37402  or the

Bankruptcy Court located in Chattanooga, Tennessee, on May 6, 2015, at 10:00 a.m.

Auction Participants: Only Buyer and any party that made a Qualified Competing Bid shall be entitled to attend or participate in the Auction.

Bidding Procedures at Auction: At the Auction, bidding will commence with Debtor's counsel reading the highest Qualified Competing Bid made by any bidder other than Buyer. Bidding shall continue until the highest bid has been made and no other person desires to bid. All bids must be all cash (other than any credit bid made by Buyer) and must be at least $100,000.00 more than the immediately preceding bid.

Selection of Prevailing Bidder: At the conclusion of the Auction, the Debtor shall select the highest and best bid. Calculation of the highest and best bid shall take into account payment of any Expense Reimbursement Fee, if the Auction were to result in a sale to a bidder other than Buyer. The Debtor also reserves the right to take into account any other factors that it deems relevant.  The bidder that prevails at the Auction shall be referred to as the "Prevailing Bidder."

Credit Bid Right: If the Buyer bids at the Auction, the Buyer will be entitled to a "credit" in the amount of the Expense Reimbursement Fee to be counted towards its bid such that the cash and other consideration proposed by the Buyer plus the Expense Reimbursement Fee "credit" must exceed the most recent bid by at least the Minimum Overbid amount.

4.   Hearing and Sale Free and Clear of Liens

No Qualified Competing Bids: If no Qualified Competing Bid is made, then a hearing shall be held before the Bankruptcy Court on May 7, 2015, at 3:00 p.m., or the first date thereafter on which the court is available, for the purpose of entering an order approving the sale of the Purchased Assets to Buyer on the terms and conditions set forth in the Asset Purchase Agreement.

Qualified Competing Bids: If a Qualified Competing Bid is made, and an Auction takes place, then a hearing shall be held before the Bankruptcy Court on May 7, 2015, at 3:00 p.m., the first date thereafter on which the court is available, for the purpose of entering an order approving the sale of the Purchased Assets to the Prevailing Bidder, on the terms of its Prevailing Bid.

|  | No Bidding at Hearing: | No bidding shall be permitted at such court hearings or at any other time after conclusion of the Auction. |
|---|---|---|
|  | Sale Free and Clear: | Sale of the Purchased Assets to Buyer (or another Prevailing Bidder) shall be free and clear of any and all liens, claims, encumbrances, or interests of any sort whatsoever against Debtor or the Purchased Assets, other than any such liens, claims, encumbrances or interests to which the Prevailing Bidder may agree, in its sole discretion. Any liens on the Purchased Assets shall attach to the sale proceeds. |
| 5. | Expense Reimbursement | If Debtor sells or otherwise disposes of the Purchased Assets, or any portion thereof or interest therein, whether directly or indirectly, including by means of an asset sale, deed transfer, stock sale, merger, reorganization, lease, or other transaction, regardless of the form or nature thereof, to a person or entity other than Buyer (including to a Prevailing Bidder other than Buyer) at any time during Debtor's bankruptcy case (an "Alternative Transaction"), and Buyer has not breached any material provision of the Asset Purchase Agreement, then Debtor shall pay to Buyer $75,000.00 as an Expense Reimbursement Fee. |
|  | Timing of Payment of Expense Reimbursement: | The Expense Reimbursement shall be paid within 10 business days after the closing of an Alternative Transaction, as an administrative priority expense (with priority over any and all other administrative priority expenses in Debtor's bankruptcy case or in any subsequent Chapter 7 case to which Debtor's bankruptcy case may be converted. |
| 6. | Binding Effect: | The Bid and Auction Procedures shall survive conversion or dismissal of Debtor's bankruptcy case or confirmation of a plan of reorganization, and Buyer's rights under these Bid and Auction Procedures shall not be modified by any confirmed plan. The Bid and Auction Procedures shall be binding upon any successor to Debtor, including any trustee appointed for Debtor or its bankruptcy estate. |

38.     The Debtor has reached the conclusion that a prompt asset sale is necessary based upon consideration of many factors, including its rapidly accumulating losses, very little cash reserves, difficulty in obtaining and retaining trade credit terms, and need for prompt cash infusions to support the business plan and avoid liquidation. The Debtor has concluded, in the exercise of its business judgment, that a prompt asset sale to a financially capable Buyer represents

the best manner in which to preserve the going concern and maximize value to creditors of the Debtor's Chapter 11 estate. The proposed sale is therefore warranted.

39.     A going concern asset sale will preserve jobs that would otherwise be lost and will pay creditors more than they would receive if the Debtor were liquidated. In addition, the Debtor's vendors and customers not only have been encouraged by a sale of the Debtor's business as a going concern, but, in many instances, have continued to do business with the Debtor in anticipation that such a sale would occur. If the sale is not completed, this vendor and customer support most likely would decrease and the Debtor could suffer severe harm if vendors do not supply unique and critical items or customers begin the process of purchasing elsewhere. Thus, there is more than adequate business justification to sell the Debtor's assets to Buyer or to the highest bidder at an auction.

40.     Aside from the Buyer Purchase Price, Buyer has agreed to consider assumption of numerous leases and contracts of the Debtor, as well as certain postpetition, pre-closing liabilities incurred by the Debtor in ordinary course of business, as set forth in the Asset Purchase Agreement, but is under no obligation to do so.  In addition, Buyer's offer contains no material contingencies (including, without limitation, no contingencies for financing), and Buyer has demonstrated a willingness and ability to close the sale of the Debtor's assets as provided in the Asset Purchase Agreement.

41.     The proposed sale also is the product of good faith negotiations, in which the Debtor bargained for the maximum possible purchase price for its assets. The negotiations involved substantial time and energy by the parties and their professionals, and the Asset Purchase Agreement reflects give-and-take and compromises by both sides. The Debtor insisted that the

13

purchase be subject to higher and better bids, pursuant to customary bidding procedures, in order

to secure that the estate receives maximum value for its assets, based upon a "market test" of the

Buyer offer.  Under the circumstances, the Debtor submits that the proposed sale is the result of

good faith negotiations and that Buyer, or the highest bidder at the Auction, should be entitled to

all of the protection of Section 363(m) of the Bankruptcy Code, which is further addressed below.

## THE ASSET SALE SATISFIES THE REQUIREMENTS OF SECTION 363(f) OF THE BANKRUPTCY CODE FOR A SALE FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS

42.    Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—
>
> applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> such entity consents;
>
> such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> such interest is in a bona fide dispute; or
>
> such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

## THE SALE OF ASSETS IS FREE OF ANY SUCCESSOR LIABILITY

43.    Buyer should not be liable for any of the Debtor's liabilities (other than assumed

liabilities), as a successor to the Debtor's business or otherwise (the "Excluded Liabilities").

Extensive case law exists providing that claims against the Debtor are directed to the proceeds of

a free and clear sale of property and may not subsequently be asserted against a Buyer.

14

44.     In this matter, Buyer is unwilling to purchase assets from the Debtor, supposedly free and clear of claims, liens, rights, interests and encumbrances only to be forced to repeatedly relitigate the issue with the individual claimants after the sale is completed. Accordingly, any potential claimants should be compelled to look exclusively to the proceeds of the sale for satisfaction of their claims and any competing allegations should be resolved in the context of this Chapter 11 case.

## AUTHORIZATION OF ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS AND LEASES

45.     As required by the Asset Purchase Agreement, and to enhance the value to the Debtor of its assets (by curtailing further administrative liability to the estates and to eliminate substantial rejection claims), the Debtor requests approval, under 11 U.S.C. § 365, of the assumption and assignment of the Assigned Contract and Leases (as described in the Asset Purchase Agreement) to Buyer or, alternatively, to the highest bidder at the Auction. The Debtor further requests that the Order approving such sale provide that the Assigned Contracts and Leases will be transferred to, and remain in full force and effect for the benefit of, Buyer (or other successful bidder) notwithstanding any provisions in the Assigned Contracts and Leases, including those described in Sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assignment. The Assigned Contracts and Leases will be identified in a schedule to the Asset Purchase Agreement that will be provided at or before the closing of the sale.

46.     Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if—
> the trustee assumes such contract or lease in accordance with the provisions of this section; and

15

> adequate assurance of future performance by the assignee of such
> contract or lease is provided, whether or not there has been a default
> in such contract or lease.

§ 365(f)(2).

47.     The Debtor will send a "cure notice" to all counterparties to the Assigned Contracts

and Leases, notifying such counterparties of the potential assumption by the Debtor and

assignment to Buyer (or to the highest and best bidder at the Auction) of the Assigned Contracts

and Leases. The "cure notice" also sets forth the "cure" amounts owing for each such Assigned

Contract and Lease, according to the Debtor's books and records.

48.     Counterparties to the Assigned Contracts and Leases will be given time to assert an

objection to the proposed cure amounts set forth in the "cure notice." To the extent no objection is

asserted with regard to a particular cure amount, such cure amount shall be binding on both the

Debtor and the applicable contract or lease counterparty. The payment of the cure amounts

specified in the "cure notice" (or a different amount either agreed to by the Debtor or resolved by

the court as a result of a timely filed objection filed by a contract or lease counterparty) will be in

full and final satisfaction of all obligations to cure defaults and compensate the counterparties for

any pecuniary losses under such contracts or leases pursuant to Section 365(b)(l) of the Bankruptcy

Code, unless (1) it is determined, prior to the sale hearing, that a particular lease or contract is not

truly executory, and does not need to be cured to transfer the assets being assigned, or (2) the Buyer

decides not to purchase a particular contract, in which case the Debtor may reject the contract.

49.     Buyer is prepared to show at the sale hearing that it is adequately capitalized to

perform its obligations under the Asset Purchase Agreement and under the Assigned Contracts and

Lease. Moreover, any qualified overbid must contain evidence that the bidder provide adequate

assurance of future performance with respect to the Assigned Contracts and Leases. Consequently,

16

assumption and assignment of the Assigned Contracts and Leases is appropriate under the circumstances.

50.     The Asset Purchase Agreement is a fair transaction, in which Buyer has, at all times, acted in good faith. The Debtor thus requests that the court make a finding that Buyer has purchased the assets at issue and has taken by assignment the specified executory contracts and unexpired leases in good faith within the meaning of Section 363(m) of the Bankruptcy Code.

## CONCLUSION

THEREFORE, Debtor respectfully requests the court to enter an order:

A.     Approving the bidding procedures and bidder protections and setting a final hearing on this Sale Motion

B.     Approving at the final hearing the sale of the Assets and Business to Buyer for a purchase price of $1,075,000.00 on the terms and conditions of the Asset Purchase Agreement attached as Exhibit A;

C.     Finding that Buyer is a good-faith Buyer of the Business and Assets entitled to all the protections afforded by 11 U.S.C.A. § 363(m);

D.     Approving the sale free and clear of all liens and encumbrances relating to the Assets, and Business, with all other such liens and encumbrances to attach to the net proceeds of the sale;

E.     Granting such other and further relief as is just.

RESPECTFULLY SUBMITTED:

FARINASH & HAYDUK

By:   /s/ Jerrold D. Farinash
JERROLD D. FARINASH, (BPR #10220)
Attorneys for Phillips Brothers Machine
Company, Inc.
100 West M L King Blvd, Ste. 816
Chattanooga, Tennessee 37402
jdf@fandhlawfirm.com
(423) 805-3100

# EXHIBIT A

ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of this 2nd day of April, 2015 (the "Effective Date"), by and between PHILLIPS BROTHERS MACHINE COMPANY, INC., a corporation duly organized and existing under the laws of the State of Georgia (the "Seller"), and PHILLIPS CONSOLIDATED, LLC, a limited liability company duly organized and existing under the laws of the State of Delaware (the "Purchaser") , and, in consideration of the mutual covenants, agreements, and warranties herein contained, and for other good and valuable consideration, the receipt and sufficient of which are hereby acknowledged. Seller and Purchaser (each a "Party" and, collectively, the "Parties.") hereby agree as follows:

RECITALS

WHEREAS, Seller is a debtor and debtor-in-possession in a bankruptcy case number 15-10870 (the "Bankruptcy Case"), filed on March 4, 2015 (the "Petition Date"), under Chapter 11 of Title 11 of the United States Code, II U.S.C. § 101, *et seq.* (the "Bankruptcy Code"), and pending before the United States Bankruptcy Court for the Eastern District of Tennessee (the "Bankruptcy Court"), which, subject to approval by the Bankruptcy Court, may sell certain assets of the Seller and its bankruptcy estate used in the conduct of Seller's business operations (as currently conducted, the "Business"); and

WHEREAS, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, substantially all the assets of Seller, including any and all machinery, equipment, inventory, supplies, intellectual property, certain executory contracts and leases, and other related assets, all as more particularly described herein, free and clear of all liens, claims, and encumbrances to the maximum extent permitted by the Bankruptcy Code, including, without limitation, Sections 105, 363, and 365 therein, on the terms and subject to the conditions set forth in this Agreement (collectively, the "Transaction"); and

WHEREAS, the Parties understand, contemplate, and agree that this Agreement shall be subject to approval by the Bankruptcy Court,

WHEREAS, Seller is also seeking financing from Duke Street Trust, LLC. for a debtor-in-possession loan of up to $1,050,000 (the "DIP Facility") in connection with the Bankruptcy case, subject to Bankruptcy Court approval; and

NOW, THEREFORE, in consideration of the foregoing Recitals and of the mutual covenants and agreements contained herein, the receipt and legal sufficiency of which each of the Parties hereby acknowledges, the Parties hereby agree as follows:

ARTICLE I
RECITALS; DEFINITIONS; GENERAL CONSTRUCTION

1.01 <u>Recitals.</u> The foregoing recitals are continued by the Parties as true and correct and are incorporated herein by reference. The recitals are a substantive, contractual part of this

1

Agreement.

1.02 <u>Defined Terms.</u> With the exception of those certain terms which are defined elsewhere in this Agreement (including in the foregoing Recitals), the following terms shall have the meanings assigned below:

(a)    "Accounts Receivable" shall mean all Seller's accounts receivable relating to the Business, including, without limitation, (i) all accounts receivable invoiced as of the Closing Date (as hereinafter defined in Section 7.01), (ii) all accrued accounts receivable uninvoiced as of the Closing Date, (iii) all other rights to payment for goods or services sold, delivered or performed  and (iv) all accounts receivable set forth on Exhibit 2.01 hereto.

(b)    "Assets" shall mean, collectively, all of the Debtor's assets of any nature whatsoever, real, personal or mixed, known or unknown including, but not limited to Equipment, Inventory, Supplies, Intellectual Property, all of Seller's books, accounting records, Intangible Personal Property, Records, Assumed Contracts, pre-paid assets, refunds, unclaimed funds, customer and other deposits, including utility deposits, and other intangible and tangible assets, whether real, personal, or mixed, owned and held for use by Seller in connection with the Business, but excluding the Excluded Assets.

(c)    "Assumed Contracts" shall mean those Contracts which will be assumed by Seller and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code, such Assumed Contracts to be identified in writing by Purchaser as provided in <u>Section 2.06</u> of this Agreement.

(d)    "Assumed Liabilities" shall mean only those liabilities and obligations of Seller which accrue for performance subsequent to the Closing (as hereinafter defined) under the Assumed Contracts expressly assumed by Seller and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code as set forth in <u>Section 2.06</u> of this Agreement, and such other liabilities and obligations of Seller which Purchaser has expressly agreed herein to assume.

(e)    "Contracts" shall mean, collectively, all executory contracts, leases, subleases and other agreements, purchase orders, options, and commitments, whether oral or written, and all assignments, amendments, schedules, exhibits, and appendices thereof, incident to Seller's ownership, operation, or management of the Business, or any interest therein, to which Seller is a party or by which Seller or the Assets are bound or affected, including, but not limited to, equipment leases, subleases, purchase orders, options, commitments, contracts for personal services and other service agreements, warranties, employment agreements, contracts for repair, maintenance, pest control, supplies, and the like, rental agreements, utility contracts, management agreements, indentures, bonus, incentive, profit-sharing, or retirement plans, health, dental, life, or hospitalization plans or policies, and employee benefits of any kind.

(f)    "Claim" shall mean any action, cause of action, claim, proof of claim, damage, demand, proceeding, fine, injury (including death), investigation, judgment, lawsuit, liability, loss, penalty, settlement or expenses of any nature, whether known or unknown, at law or in equity, including any and all claims and causes of action under Sections 544 through 550 of the Bankruptcy Code.

(g)    "Equipment" shall mean all furniture, equipment, machinery, apparatus, appliances, vehicles, trucks, trailers, rolling stock, fixtures, office equipment, motors, tools, dies, parts, jigs, molds, models, computers, data processing equipment, security systems, and other personalty, now or hereafter owned or held for use by Seller in connection with the operation of the Business, and any and all spare parts associated with the same that are in Seller's possession or under Seller's control, including that Equipment specified on Exhibit 2.01 hereto, and any and all attachments, accessories, accessions, replacements, substitutions, additions and improvements thereto

2

wherever located.

(h) "Excluded Assets" shall mean those items mutually identified and agreed to by the Parties hereto in writing, if any, as provided in Section 2.05 of this Agreement.

(i) "Excluded Liabilities" shall mean the following liabilities of the Seller, together with all other liabilities and obligations of Seller whether or not disclosed herein or in writing to Purchaser prior to the Closing Date (as hereinafter defined), other than the Assumed Liabilities:

(i) any outstanding amounts of principal, interest, fees and expenses in respect of borrowed money, letters of credit, capital leases, and installment purchases;

(ii) any obligations related to Taxes, including any retroactive adjustments to Taxes as made by the applicable taxing authority that relate to the period prior to the Closing, and taxes owed by Seller associated with the Closing;

(iii) any obligations under this Agreement or any agreement entered into in connection with the Transaction (other than the obligations of Purchaser set forth herein);

(iv) any litigation, suit, proceeding, arbitration, Claim, audit or investigation, filed or otherwise, with respect to the affairs of the Seller, the Business, and the other Assets, accruing or arising on or prior to the Closing Date regardless of when such matter is initiated;

(v) any workers' compensation liabilities, obligations, or Claims of any nature whatsoever applicable to Seller and its operation of the Business;

(vi) any liabilities, obligations, or Claims of any nature whatsoever related to any failure by Seller to comply with any applicable regulations or requirements, whether related to the Business, the Assets, or otherwise, accruing or arising on or prior to the Closing Date;

(vii) any regulatory or enforcement proceeding, action, or investigation initiated by or on behalf of any governmental entity, which relates to any alleged act or failure to act which occurs on or prior to the Closing Date, regardless of when such proceeding, action, or investigation is initiated;

(viii) any liabilities, obligations, or Claims of any nature whatsoever that are related to any pension, profit-sharing, retirement, employee benefit, or similar plan, 401(k) plan, benefit or arrangement, including any and all obligations of Seller to employees, participants, or beneficiaries in respect of any (A) retirement plan or (B) accrued paid time off, vacation, or similar compensation or benefits, except to the extent Seller shall specifically assume any obligations described in (A) or (B) of this subsection and assign the same to Purchaser under the terms of this Agreement pursuant to Section 365 of the Bankruptcy Code;

(ix) any liabilities, obligations, or Claims of any nature whatsoever relating to any health insurance or similar benefit or arrangement provided by Seller to its employees;

(x) any liabilities, obligations, or Claims of any nature whatsoever relating to any Contracts that are not Assumed Contracts;

(xii) any liabilities, obligation, or Claims of any nature whatsoever relating to any Assumed Contracts, including any pre-Closing breaches thereof by Seller, that arise or relate to any period on or prior to the Closing Date, including any liabilities or obligations arising under Section 365(b)(1)(A) and (B) of the Bankruptcy Code;

3

(xiii) any liabilities, obligations, or Claims of any nature whatsoever relating to the Excluded Assets;

(xiv) any liabilities, obligations, or Claims against Seller of any nature whatsoever with respect to the Assets that accrue or arise or relate to any period on or prior to the Closing Date;

(xv) any liabilities, obligations, or Claims of any nature whatsoever (whether or not disclosed herein) arising out of the ownership, licensing, operation, action, inaction, or conduct of Seller or the Business relating to all periods of time prior to the Closing;

(xvi) any liabilities, obligations, or Claims against Seller of any nature whatsoever that accrue or arise or relate to any period on or prior to the Closing Date;

(xvii) the aggregate amount payable by Seller through the Closing Date, or arising as a result of the Transaction, for (A) legal, accounting, investment banking, broker and other fees and expenses; (B) sales and use taxes, documentary stamp, transfer, privilege, excise or other similar taxes or fees arising from the Transaction; and (C) all other payments, costs, and expenses incurred by Seller in connection with or as a result of the Transactions; and

(xviii) any duty whatsoever to take any action or receive or make any payment or credit arising from or related to any of the foregoing.

(j) "Government Authorizations" shall mean all licenses, permits, approvals, certificates of need and occupancy, facility certifications, consents and other authorizations from all federal, state, municipal, and other governmental agencies or authorities any and quasi-governmental or private body exercising any regulatory, taxing, or other governmental or quasi-governmental authority over Seller and the Business as are necessary for Seller to lawfully operate the Business.

(k) "Intangible Personal Property" shall mean the trade name "Phillips Brothers Machine Company" under which the business is operated; any Intellectual Property of Seller, whether relating to Seller's ownership and operation of the Business or otherwise; Seller's rights to any engineering and architectural plans and specifications, drawings, studies, any other intangible personal property used in connection with Seller's ownership or operation of the Business, including, but not limited to, that Intangible Personal Property specified on Exhibit 2.01 hereto.

(l) "Intellectual Property" shall mean all intellectual property rights of Seller throughout the world, including all: (1) patents, patent applications, continuations, continuations-in-part, divisions, reissues, and patent disclosures; (ii) trademarks, service marks, trade dress, corporate names, trade styles, trade names, and fictitious names (and any and all translations, adaptations, derivations, and combinations of the same), together with all goodwill associated with each of the foregoing; (iii) internet domain names and registrations thereof; (iv) copyrights and design rights, whether registered or unregistered, together with all goodwill associated with each of the foregoing; (v) registrations and applications for any of the foregoing; (vi) computer software of any nature whatsoever; and (vii) know-how, trade secrets, and designs, customer lists, supplier lists, pricing and cost information, business and marketing plans, and other confidential or proprietary business information, as well as that Intellectual Property specified on Exhibit 2.01 hereto.

(m) "Inventory" shall mean any and all of Seller's finished and in-process, but unsold, goods produced in the normal operation of the Business and any and all of Seller's raw materials from which such goods are derived, whether such Inventory is held by Seller, in transit, or otherwise, including, but not limited to, that Inventory specified on Exhibit 2.01 hereto.

(n) "Material Adverse Change" shall mean any event, circumstance, change, or effect that, individually or in the aggregate, has or would reasonably be expected to have a material adverse effect on Seller, the Business, the Assets, the Assumed Liabilities, Seller's condition (financial or otherwise), or the results of Seller's Business operations, taken as a whole.

(o) "Records" shall mean all books and records maintained in connection with Seller's ownership of the Assets and the Business, including, but not limited to, those Records specified on Exhibit 2.01 hereto, but excluding any books or records relating solely to the Excluded Assets and Seller' corporate entity as distinct from the Assets and the Business.

(p) "Supplies" shall mean all supplies owned or controlled by Seller, whether stored at the Improvements or otherwise, including cleaning materials, spare parts, and other supplies for the maintenance of the improvements and Assets, and all other supplies used in the normal operation of the Business, including, but not limited to, those Supplies specified on Exhibit 2.01 hereto.

(q) "Taxes" shall mean any federal, state, local, or foreign taxes, charges, fees, duties, levies, or other assessments, including income taxes and taxes on gross receipts, capital stock, franchise, profits, withholding, social security, escheat, or abandoned property, unemployment, disability, net proceeds, ad valorem, turnover, real, personal, and other property (tangible and intangible), stamp, excise, occupation, sales, use, value added, leasing, lease, user, transfer, fuel, interest equalization, unitary, duties, alternative minimum, and any other taxes, assessments, and charges (including the recapture of any tax items such as investment tax credits) imposed by any federal, state, municipal, and other governmental agency or authority or quasi-governmental or private body with authority to impose and collect such taxes, charges, fees, duties, levies, or other assessments, including (i) any interest, penalties, or additions related to such taxes, charges fees, duties, levies, or other assessments and (ii) any obligations to indemnify or otherwise assume or succeed to the tax liabilities of any other person or entity.

1.03 <u>General Construction.</u> References in this Agreement to "paragraphs", "sections", "subsections", "articles", "exhibits", and "schedule" are to paragraphs, sections, subsections, articles, exhibits, and schedules herein and hereto unless otherwise indicated. Words such as "herein", "hereof", "hereby", and "hereunder", and words of similar import, refer to this Agreement as a whole and not to any particular paragraph, section, subsection, article, exhibit, or schedule of this Agreement The word "including" means Including without limitation." Wherever from the context it appears appropriate, each term stated in either the singular or the plural, or the masculine, feminine, or neuter, shall include the singular and the plural, or the masculine, feminine, and neuter, as applicable. References in this Agreement to any documents, instrument, or agreement (a) shall include all exhibits, schedules, riders, and other attachments thereto; (b) shall include all documents, instruments, or agreements issued or executed in replacement thereof; and (c) shall mean such document, instrument, or agreement, or replacement or predecessor thereto, as amended, modified, or supplemented from time to time and in effect at any given time. Unless otherwise indicated, all references to time set forth herein are references to the prevailing Eastern Time in place in Walker County, Georgia, as of the Effective Date of this Agreement.

ARTICLE II
AGREEMENT AND CONSIDERATION

2.01 <u>Agreement to Sell and Purchase.</u> In consideration of the mutual covenants and promises contained in this Agreement, and subject to the approval of the Bankruptcy Court to be set forth in the Sale Order (as hereinafter defined), Seller agrees to sell, assign, transfer, and convey unto Purchaser the Assets, and Purchaser agrees to purchase all of Seller's right, title, and interest in and to the Assets, upon the terms and conditions set forth herein, such Assets being more particularly described on Exhibit 2.01

5

attached hereto. Subsequent to the Effective Date of this Agreement until the Closing, Purchaser and Seller may mutually agree to amend, modify, or supplement such exhibit.

2.02 <u>Consideration.</u> Purchaser agrees to pay Seller the sum of one million seventy-five thousand dollars ($1,075,000) (the "Purchase Price"), and to assume the Assumed Liabilities and Assumed Contracts, in consideration for the sale and assignment of the Assets, irrespective of any post-Effective Date amendments, modifications, and supplements to Exhibit 2.01 and Exhibit 2.07 as may be agreed upon by and between the Parties.

2.03 <u>Method of Payment.</u> At the Closing, Purchaser shall pay the Purchase Price, subject to any and all adjustments provided for herein, to Seller, in cash or other immediately available funds.

2.04 <u>Allocation of Purchase Price.</u> The Parties shall use all reasonable, good faith effort to agree prior to the Closing to an allocation of the Purchase Price among the Assets transferred to Purchaser; provided, however, that such failure to agree on such allocation of the Purchase Price shall not constitute a default by either party hereto or a failure of any condition precedent to the Closing. The Parties acknowledge and agree that such allocation shall, in any event, not be binding upon a creditor of the Seller without such creditor's consent.

2.05 <u>Excluded Assets.</u> In entering into this Agreement, Purchaser shall not acquire, as a result of the Transaction set forth herein, any interest in any of the Excluded Assets, such Excluded Assets described more particularly on Exhibit 2.05 to this Agreement, including without limitation the rights relating to certain utility deposits set forth on Exhibit 2.05, and specifically disclaims any interests whatsoever therein. Subsequent to the Effective Date of this Agreement until the Closing, Purchaser and Seller may mutually agree to amend, modify, or supplement such exhibit.

2.06 <u>Excluded Liabilities.</u> In entering into this Agreement, Purchaser shall not incur any obligations or liabilities of any nature whatsoever with regards to the Excluded Liabilities, all of which Purchaser specifically disclaims

2.07 <u>Assumed Contracts.</u> As part of the Sale Motion (as hereinafter defined), to the extent required by Section 365 of the Bankruptcy Code, Seller, at its sole expense, shall seek approval from the Bankruptcy Court to be set forth in an entered Sale Order (as hereinafter defined) of Seller's assumption and assignment to Purchaser of the Assumed Contracts identified more specifically on Exhibit 2.07 hereto, such exhibit being subject to amendment, modification, and supplementation as may be agreed upon by and between the Parties subsequent to the Effective Date. Purchaser shall have the right to designate additional Contracts as Assumed Contracts under this Agreement by providing written notification to Seller of such designation no later than ten (10) calendar days subsequent to the Closing Date. Under all such circumstances contemplated under this section of the Agreement, it shall be Seller's sole responsibility to notify the counterparties to such Assumed Contracts (collectively, the "Contractual Counterparties") of such Assumed Contracts' designation by Purchaser, and seek entry of an appropriate order by the Bankruptcy Court to confirm such Assumed Contracts assumption by Seller and assignment to Purchaser pursuant to the terms of this Agreement. All of Seller's obligations, liabilities, and duties under any and all Assumed Contracts arising, relating to, or accruing prior to the Closing, to the extent the same are not Assumed Liabilities hereunder, including any and all obligations arising under Section 365(b)(1)(A) and (B) of the Bankruptcy Code, shall be the sole responsibility of Seller. In connection with Seller's assumption of the Assumed Contracts and assignment thereof to Purchaser, Purchaser shall assume, as Assumed Liabilities, any and all of Seller's obligations under such Assumed Contracts to the applicable Contractual Counterparties thereon, but only to the extent that such obligations accrue subsequent to the Closing. To the extent that performance under any Assumed Contracts is secured by Seller's posting of a deposit, whether such deposit is posted in the form of a cash deposit letter-of-credit, or otherwise, in favor of the applicable Contractual

6

Counterparties thereon, such deposits shall be assigned to Purchaser in connection with Seller's assumption of such Assumed Contracts and their assignment to Purchaser pursuant to the terms hereof.

2.08 <u>Further Conveyances and Assumptions.</u> From time to time following the Closing, Seller and Purchaser will execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to Seller and its successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the Transaction contemplated hereby.

ARTICLE III
REPRESENTATIONS AND WARRANTIES

3.01 <u>Seller's Representations and Warranties.</u> Seller makes the following representations and warranties to Purchaser, all of which shall be true and correct as of the Effective Date and as of the Closing Date:

(a)    Seller is the owner of the Assets and has the authority, subject to the necessary Bankruptcy Court approval, to execute this Agreement; and

(b)    Upon approval of the Sale Order, the Seller will, and will have the right to, transfer and convey title to the Assets to the fullest extent allowed by the Sale Order, free and clear of all liens and encumbrances.

3.02 <u>Purchaser's Representations and Warranties.</u> Purchaser makes the following representations and warranties to Seller, all of which shall be true and correct as of the Effective Date and as of the Closing Date:

(a)    <u>Organization of Purchaser.</u> Purchaser is a limited liability company, duly organized and validly existing and in good standing under the laws of the State of Delaware. Prior to the Closing Date, Purchaser shall duly qualify to do business in the State of Georgia;

(b)    <u>Authority.</u> The execution and delivery of this Agreement and the consummation of the Transaction have been duly and validly authorized by all necessary action on the part of Purchaser, and this Agreement constitutes, and the documents contemplated hereby will be, valid and legally binding obligations of Purchaser, enforceable in accordance with their terms, subject to bankruptcy, insolvency, and other statutes affecting creditors' rights generally;

(c)    <u>Conflict or Default.</u> Neither the execution nor delivery of this Agreement nor the consummation of the Transaction, will conflict with, violate, result in a breach by, constitute a default under, or accelerate the performance provided by the terms of, any law, rule, regulation, organizational document, order, writ, judgment, or decree of any court or administrative agency to which Purchaser may be subject;

(d)    <u>Consent.</u> No consent or approval by any governmental or nongovernmental person or entity is required in connection with the execution, performance, and delivery by Purchaser of this Agreement, or the consummation by Purchaser of the Transaction, *except* for such consents or approvals by the Bankruptcy Court and the Governmental Authorizations;

(e)    <u>Financial Capacity.</u> Purchaser has the financial capacity to timely

7

consummate the Transaction.

(f)    Government Authorizations.    Purchaser reasonably believes it has the necessary credentials, ability, and financial strength to obtain the Government Authorizations and to become an operator of the Business if the Transaction is approved by the Bankruptcy Court; and

(g)    Broker's Fees.    Purchaser has not engaged any broker or acquisition consultant with respect to the Transaction so as to give rise to any valid claim against any of the Parties hereto for a brokerage commission or consulting fee.

(h)    Litigation. There are no legal proceedings or order pending or, to the knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a material adverse effect on Purchaser's ability to complete the Transaction.

ARTICLE IV.<br/>COVENANTS

4.01 Covenants of Seller. Seller hereby agrees with Purchaser as follows:

(a)    Interim Operations. Except for actions taken in the Bankruptcy Case, in accordance with the provisions of the Bankruptcy Code and the orders of the Bankruptcy Court or as otherwise contemplated by this Agreement, Seller agrees from the Effective Date of this Agreement to the Closing Date as follows:

(i)    To promptly respond to Purchaser's reasonable requests for further information and to permit representatives of Purchaser (including financial and legal representatives, lender and other financing sources, and their respective representatives) to have reasonable access, at all reasonable times, to all premises, properties, personnel, suppliers, customers, counsel, accountant; representatives and books, records (including tax records), Contracts, and documents of or pertaining to the Business and the Assets, and to conduct such necessary inspections as the Purchaser or its representatives (including legal and financial representatives, lender or other financing sources, and their respective representatives) may reasonably request.

(ii)    To cause the officers, employees, counsel, accountants, consultants, and other representatives of Seller to furnish Purchaser with such financial and operating data and other information with respect to the Business and the Assets as Purchaser shall from time to time reasonably request (in each case, consistent with any applicable privacy laws).

(iii)    To take all reasonable steps to preserve intact the Business's business organization and employees, to preserve Seller's relationships with all persons having business dealings with it and to otherwise operate the Business in its ordinary course.

(iv)    To take all reasonable steps to maintain the Assets in accordance with current practices.

(v)    To not make any changes or modifications in any material agreement affecting the Business or the Assets, incur any further obligations or surrender any rights thereunder other than as routinely occur in the ordinary course of business, and to maintain in full force and effect any and all Governmental Authorizations necessary to operate the Business in substantial compliance with all applicable laws.

(vi)    To maintain Seller's Records as applicable to the Business and the Assets in accordance with current practices.

8

(vii)  To not dispose of or encumber any Assets, or any portion thereof, other than Inventory sold in the ordinary course of business.

(viii)   To maintain insurance on the Business and the Assets in accordance with its current practices, with the understanding that any policy proceeds shall be used for the repair or replacement of the Assets damaged or destroyed.

(ix) To not do any act or omit to do any act that would amend, terminate, waive, or cause a breach of any Assumed Contract, or any Contract that Seller reasonably believes may become an Assumed Contract pursuant to the terms of this Agreement, or that would cause a Material Adverse Change.

(x)  To not grant any increase in compensation, or enter into or amend any bonus, incentive compensation, deferred compensation, profit sharing, retirement, pension, group insurance, death benefit, or other fringe benefit plan, trust agreement or arrangement, or any employment or consulting agreement, in each case that is not consistent with past practices.

(b)  Government Authorizations. Seller shall cooperate with Purchaser in obtaining all Government Authorizations in the name of Purchaser or Purchaser's designee as soon as practicable.

(c)  Satisfaction of Conditions. Seller shall use all reasonable efforts to promptly perform the agreements, undertaking, obligations, and covenants herein provided to be performed by it and to enable the conditions precedent to the Closing (as the same are more particularly specified herein) to be satisfied.

4.02  Covenants of Purchaser. Purchaser hereby further agrees with Seller as follows:

(a)  Government Authorizations. Purchaser shall use its best efforts to promptly obtain all Government Authorizations in its name or the name of its designee.

(b)  Satisfaction of Conditions. Purchaser shall use all reasonable efforts to promptly perform the agreements, undertakings, obligations, and covenants herein provided to be performed by it and to enable the conditions precedent to the Closing to be satisfied.

(c)  Access to Records. Following the Closing, Seller shall have reasonable access to any Records transferred to Purchaser under the transactions contemplated herein, and shall be permitted to review and make copies of and extractions from the Records as may be determined by Seller to be necessary in connection with the Bankruptcy Case, any litigation or tax matters, or the winding up of Seller's business operations; provided, however, that Purchaser shall have no obligations hereunder to provide Seller or any other person or entity with any information whatsoever as to Purchaser's post-Closing operation of the Business.

ARTICLE V.
ASSET DUE DILIGENCE

5.01   Access and Due Diligence.  In accordance with Section 4.01, in conducting the review of Seller's Business, Purchaser will provide Seller with at least one (1) business day advanced notice of the time when Purchaser intends to conduct its due diligence and for access to Seller's property and records and, further, Purchaser's agents, auditors, attorneys, consultants and other authorized representatives will not disrupt or interfere with Seller's Business.

5.02  No Obligation to Provide Diligence Materials. Except as specifically provided herein, Purchaser shall be under no obligation to provide a copy of, or any portion of, any due diligence report (collectively the "Diligence Items") to Seller or any other person.

9

ARTICLE VI.
CONDITIONS

6.01 <u>Conditions to Purchaser's and Seller's Obligations.</u> The respective duties and obligations of the Parties under the terms and conditions of this Agreement are and shall be expressly conditioned upon the following (which may be waived, respectively, in whole or in part, by Purchaser or Seller in writing):

     (a)    <u>Sale Motion: Sale Procedures Order.</u> Seller shall, within five (5) days of the Effective Date, file and duly serve a motion (the "Sale Motion") in Seller's Bankruptcy Case seeking Bankruptcy Court approval of this Agreement and the Transaction, along with sale and bidding procedures reasonably acceptable to Purchaser, an Expense Reimbursement Fee hereinafter referenced, and other matter's incident thereto (the "Bankruptcy Court Approval") pursuant to Section 363(b) and (f) and Section 365 of the Bankruptcy Code. The Sale Motion shall attach a proposed order (the "Sale Procedures Order") and bidding procedures (together, with such later modifications as may be mutually agreed to by the Parties herein in their sole discretion or as required by the Bankruptcy Court). The Sale Procedures Order and bidding procedures shall include, without limitation, provisions that any competing bids (each a "Qualified Bid") (i) must equal or exceed the sum of the Purchase Price and the Expense Reimbursement Fee, and $100,000.00 in the first instance (the "Initial Overbid"); (ii) must provide for other terms and conditions that shall be the same or more favorable to Seller than the terms of this Agreement; (iii) must be accompanied by a cash deposit of ten percent (10%) of the Initial Overbid, all of which shall be refundable to an unsuccessful bidder; (iv) must be for cash and not subject to any financing contingencies; (v) must be from a bidder who is reasonably likely to obtain the necessary Governmental Authorizations to operate the Business; and (vi) must be accompanied by the affidavit of such competing bidder or such competing bidder's Chief Financial Officer, or similar officer, that such competing bid is for cash and is not subject to any financing contingencies and which affidavit must attach (A) written evidence showing that the competing bidder has available cash or (B) a signed, non-revocable borrowing commitment from a reputable financial institution in each instance totaling not less than the relevant Initial Overbid and any subsequent incremental increases to such Initial Overbid, and the Expense Reimbursement Fee. The Sale Procedures Order shall provide that: (i) all Qualified Bids must be received on or before 5:00 p.m. on May 8, 2015, the date that is twenty-one (21) days subsequent to Bankruptcy Court approval and entry of the Sale Procedures Order (the "Bid Deadline"); (ii) Purchaser is a qualified bidder and this Agreement constitutes its Qualified Bid; (iii) assuming another Qualified Bid is submitted, an auction will be conducted at the offices of Seller or its legal representative commencing at 8:00 a.m. on the business day immediately following the Bid Deadline; (iv) Seller will provide Purchaser with true and exact copies of any and all Qualified Bids on or before 6:00 p.m. on the Bid Deadline; (v) a final hearing to approve the sale of the Assets to the highest bidder shall be scheduled in the order approving the bid procedure, with such final hearing to be scheduled to occur on no later than May 12, 2015 (the "Approval Hearing"); and (vi) in the event Purchaser is out-bid and/or the Bankruptcy Court otherwise approves another party as the successful bidder other than as a result of Purchaser's breach of the terms of this Agreement, Seller shall pay to Purchaser, as set forth in this Agreement, the Expense Reimbursement Fee. Seller shall establish a hearing on the Sale Procedure Order no later than April 17,, 2015.

     (b)    <u>Due Diligence Expense Reimbursement.</u> In recognition of Purchaser's time and effort in examining the Business, its due diligence in respect thereof by its employees, agents, attorneys, accountants, and other representatives, its costs related to the Diligence Items, the costs of examining vendor and customer contracts, and the loss of opportunity that the expenditure of such time and effort has caused, and the fact that Purchaser's willingness to enter into this Agreement may prompt bidding by other qualified bidders, the Sale Procedures Order shall require that, in the event of Seller's breach of this agreement, or if the Assets are sold to a purchaser other than Purchaser or an

affiliate of Purchaser for such reason other than Purchaser's breach of the terms of this Agreement (an "Alternative Transaction"), the Sale Procedures Order shall further require that, in the event of Seller's breach of this Agreement, or the acceptance of an Alternative Transaction, Seller shall promptly pay to Purchaser, as set forth below, in cash or other immediately available funds, its reasonable out-of-pocket fees (including its reasonable legal expenses) and other out of pocket and intangible expenses incurred in connection with the Transaction, which amount the parties agree is $75,000.00 (the "Expense Reimbursement Fee"). The Expense Reimbursement Fee shall be due and payable to Purchaser upon the earlier of (1) five (5) days after Purchaser's written notice to Seller of Seller's breach of the terms herein, subject to Seller's right to cure such breach to Purchaser's sole satisfaction within three (3) days after Purchaser provides notice thereof to Seller or (ii) five (5) days after Court approval of an Alternative Transaction. It is understood and agreed between the Parties that the Expense Reimbursement Fee is agreed to by and between Seller and Purchaser to compensate Purchaser for the time, effort, and expenses expended and/or incurred by Purchaser used in coming to this Agreement, the total value of which may be difficult to calculate. Seller's obligation to pay the Expense Reimbursement Fee shall survive termination of this Agreement and shall be entitled to administrative expense priority pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code in the Bankruptcy Case.

(c)     Bankruptcy Sale Order. Notwithstanding any other provision of this Agreement, neither Seller nor Purchaser shall have any obligation to consummate the transactions contemplated under this Agreement without prior Bankruptcy Court Approval as set forth in an order entered by the Bankruptcy Court pursuant to applicable sections of the Bankruptcy Code that has not been vacated or modified (the "Sale Order"), which (i) approves this Agreement and the Transaction on substantially the same terms and conditions as set forth in this Agreement and authorizes Seller to proceed with such Transaction; (ii) includes a specific finding that Purchaser is a good faith purchaser of the Assets pursuant to Section 363(m) of the Bankruptcy Code; (iii) states that the sale of the Assets to Purchaser shall be free and clear of all interests, including liens, claims, and other encumbrances, to the maximum extent permitted by the Bankruptcy Code; (iv) approves Seller's assumption and assignment of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code; (v) contains protections in favor of Purchaser *against* successor liability and an injunction enjoining the same; (vi) includes a finding that due, adequate, and proper notice of the Sale Motion has been given; (vii) includes a specific finding that the Agreement is the result of an arm's-length transaction between Seller and Purchaser; and (viii) is not the subject of any stay granted by the Bankruptcy Court pending an appeal. Both Purchaser and Seller shall use reasonable efforts to obtain entry of the Sale Order and such Sale Order shall be entered no later than seven (7) days subsequent to the Bid Deadline.

(d)     The Sale Motion, the Sale Procedures Order, the Sale Order, and any exhibits thereto, including bidding procedures, and any notices or other materials in connection therewith, must be acceptable, in form and substance, to Purchaser in its reasonable discretion.

6.02 Conditions to Purchaser's Obligations. The duties and obligations of Purchaser under the terms and provisions of this Agreement are and shall be expressly conditioned upon the following (which may be waived, in whole or in part, by Purchaser in writing):

(a)     Performance of Covenants. Seller shall have timely performed all covenants and obligations and timely complied with all conditions required of Seller by this Agreement.

(b)     Representations and Warranties. All of Seller's representations and warranties contained herein shall be true, complete, and correct on the Effective Date and as of the Closing Date as if made at such time.

11

(c)  <u>Closing Documents.</u> At the Closing, Seller shall deliver or cause to be delivered each of the items required of it as specified in <u>Section 7.02</u> of this Agreement.

(d)  <u>Consent.</u> All Governmental Authorizations necessary to legally consummate the Transaction shall have been obtained, and the same shall not restrict the Purchaser from operating the Business consistent with current practices.

(e)  <u>Subsequent Events.</u> No action, investigation, litigation, or proceedings shall have been instituted or threatened before any court or governmental agency or authority to restrain or prohibit, or to obtain substantial damages in respect of, this Agreement or the consummation of the Transaction contemplated herein.

(f)  <u>Material Adverse Change.</u> No Material Adverse Change shall have occurred prior to the Closing Date.

(g)  <u>Sale Order.</u> Seller shall have obtained approval and entry of the Sale Order by the Bankruptcy Court, which shall be non-appealable.

(h)  <u>Acquisition of Lease Agreement for 1198 Shattuck Industrial Blvd.</u> Newport Hill, LLC shall have obtained an assignment from Phillips Machine Holdings, LLC of all rights, title and interest in that certain lease agreement for 1998 Shattuck Industrial Blvd., contingent upon Walker County Development Authority entering into a new lease with Newport Hill, LLC.

(i)  <u>Continuous Operations.</u> The Debtor shall have continuously operated during the post-petition period with average per diem bookings for that period to be no less than 75% of the average per diem bookings achieved during the 6 months preceding the bankruptcy filing and shall maintain minimum raw material, work in progress and finished goods, usable inventory of no less than $400,000.00.

6.03 <u>Conditions to Seller's Obligations.</u> The duties and obligations of Seller under the terms and provisions of this Agreement are and shall be expressly conditioned upon the following (which may be waived, in whole or in part, by Seller in writing):

(a)  <u>Performance of Covenants.</u> Purchaser shall have timely performed all covenants *and* obligations and timely complied with all conditions required of Purchaser by this Agreement, including, without limitation, the obligation to pay the Purchase Price to Seller.

(b)  <u>Representations and Warranties.</u> All of Purchaser's representations and warranties contained herein shall be true, complete, and correct on the Effective Date and as of the Closing Date as if made at such time.

(c)  <u>Consent.</u> All certifications, covenants, waivers, approvals, authorizations, Governmental Authorizations, and determinations by third parties necessary to legally consummate the Transaction, and to enable Seller to be in compliance with all representations, warranties, and covenants contained herein, shall have been obtained.

(d)  <u>Subsequent Events.</u> No action, investigation, litigation, or proceeding shall have been instituted before any court or government agency or authority to restrain or prohibit, or to obtain substantial damages in respect of, this Agreement or the consummation of the Transaction.

(e)  <u>Other Deliveries.</u> Purchaser shall have delivered such other items and

12

deliveries relating to the consummation of the Transaction as reasonably requested by Seller.

ARTICLE VII.
CLOSING

7.01 <u>Closing</u>. Subject to satisfaction of the conditions set forth in <u>Article VI</u> of this Agreement, including, without limitation, approval and entry of the Sale Order by the Bankruptcy Court, the consummation of the transactions contemplated by this Agreement (the "Closing') shall occur on the date (the "Closing Date") which is at least three (3) business days following entry of the Sale order and satisfaction or effective waiver of the Parties' respective conditions and contingencies specified in this Agreement, unless the date is extended by virtue of the time periods set forth in <u>Section 5.06</u> of this Agreement, or, alternatively, at a time and on a date as may be mutually agreed upon by the Parties hereto. The Closing shall be held at a location and on a date and at a time mutually agreed upon by Seller and Purchaser.

7.02 <u>Seller's Closing Deliveries</u>. At the Closing, Seller shall deliver to Purchaser the following:

(a) <u>Certified Sale Order</u>. A certified copy of the Sale Order entered by the Bankruptcy Court.

(b) <u>Bill of Sale</u>. One (1) or more bills of sale, substantially in the form of Exhibit 7.02(c) to this Agreement, conveying all Seller's rights, title, and interests in and to the Assets to Purchaser, free and clear of all liens, claims, and encumbrances whatsoever to the maximum extent provided by Section 363 of the Bankruptcy Code.

(c) <u>Assignments of Assumed Contracts and Intangible Personal Property</u>. One (1) or more assignments, assigning all rights, title, and interests in and to all Assumed Contracts and all Intangible Personal Property of Seller, including Seller's Intellectual Property, identified in or pursuant to this Agreement, such assignments to be substantially in the form of Exhibit 7.02(d)(1) and Exhibit 7.02(d)(ii) to this Agreement, respectively.

(d) <u>Records</u>. All Records with respect to or concerning the Business or the Assets that are in the possession of Seller, or under its control.

(e) <u>Other Documents</u>. Such other documents as Purchaser may reasonably request to consummate the Transaction or to evidence Seller's compliance with the covenants and agreements of Seller contained herein.

7.03 <u>Purchaser's Closing Deliveries</u>. At the Closing, Purchaser shall deliver to Seller the following:

(a) <u>Purchase Price</u>. The Purchase Price, in accordance with <u>Section 2.03</u> of this Agreement.

(b) <u>Assignment and Assumption Agreements</u>. One or more duly executed assignment and assumption agreements in a form to be agreed upon by the Parties.

(c) <u>Other Documents</u>. Such other documents as Seller may reasonably request to consummate the Transaction or to evidence Purchaser's compliance with the covenants and agreements of Purchaser contained herein.

7.04 <u>Closing Costs</u>. Seller shall pay any costs applicable to the Transaction, and the fees of its counsel and other retained representatives. Purchaser shall be responsible for the payment of the fees of its counsel and other retained representatives. Seller shall request that the Bankruptcy Court include in

13

the Sale Order a provision that no stamp or other similar tax shall be imposed with respect of the transfer of the Assets to Purchaser pursuant to Section 1146(a) of the Bankruptcy Code.

7.05 <u>Physical Inventory.</u>  Purchaser shall be allowed to complete a physical inventory of the Assets ten (10) days prior to the Closing Date, and Purchaser shall be satisfied as to the accuracy of the books and records of Seller with respect to such inventory.

7.06 <u>Accounts Payable and Other Liabilities.</u> Except as otherwise expressly set forth herein, Purchaser shall have no responsibility for accounts payable or other liabilities, including expenses for utilities, taxes, and other current expenses incurred by Seller prior to the Closing Date, and any such accounts payable and other liabilities shall be satisfied by Seller in the ordinary course of business or through a claims process established in the Bankruptcy Case.

ARTICLE VIII.
RISK OF LOSS

8.01 <u>Damage: Risk of Loss.</u> In the event there is damage to or loss to any part of the Assets (whether by fire, theft, vandalism, or other cause of casualty) between the Effective Date and the Closing, the Purchase Price shall be reduced by the amount necessary to repair the damage, which reduction shall be offset by any amounts actually received by Seller from its insurance company and assigned to Purchaser at the Closing; provided, however, in the event of a casualty which in Purchaser's judgment has caused a Material Adverse Change, Purchaser, at its sole option, may elect to terminate this Agreement in its entirety without penalty. Upon termination of this Agreement under the terms of this <u>Section 8.01</u>, no party to this Agreement shall have any further claims under this Agreement against any other party hereto.

ARTICLE IX.
SURVIVAL OF PROVISIONS

9.01 <u>Survival.</u> The respective representations and warranties of the Parties to this Agreement made herein shall expire at the effective time of the Closing. All respective covenants, obligations, and agreements of the Parties to this Agreement shall survive the Closing until complied with by the party making such covenant or agreement.

ARTICLE X.
TERMINATION

10.01 <u>Right to Terminate Agreement</u>.  This Agreement may be terminated and the transactions contemplated herein may be abandoned at any time before the Closing and Closing Date (referenced herein as "Termination Date")":

    (a) by mutual written agreement of Purchaser and Seller;

    (b) by Purchaser, if (i) any condition to close has not been satisfied by Seller or if Seller fails to comply or perform a material covenant of this Agreement; (ii) Purchaser delivers to Seller notice of such unsatisfied condition or unperformed material covenant; and (iii) Seller fails to satisfy such condition to closing or comply or perform such material covenant within ten (10) days of service of such notice;

    (c) by Seller, if (i) any condition to close has not been satisfied by Purchaser or if Purchaser fails to comply or perform a material covenant of this Agreement; (ii) Seller delivers to Purchaser notice of such unsatisfied condition or unperformed material covenant; and (iii)  Purchaser fails to

14

satisfy such condition to closing or comply or perform such material covenant within ten (10) days of service of such notice;

(d) after the entry of the Sale Order by the Bankruptcy Court, by Purchaser in writing, without liability to the Purchaser (provided the Purchaser is not otherwise in default or in breach of this Agreement), if there has been a material breach of this Agreement by the Seller which is not cured within five (5) days after Seller has been notified in writing of such breach and the intent to terminate this Agreement pursuant to this Section 10.1 if such breach is not cured;

(e) By Purchaser if the Sales Procedure Order is not entered by the Bankruptcy Court on or before thirty (30) days after the date of this Agreement;

(f) by Purchaser if the Sale Order is not entered by the Bankruptcy Court on or before ninety (90) days after the date of this Agreement; or

(g) by Purchaser in writing, if the Closing does not occur by June 1, 2015, provided Purchaser is not in default or breach of this Agreement, and further provided that Purchaser has not taken such action or failed to take such action required under this Agreement, which has been the cause or result in the failure of the Closing to occur on or before such date.

If Purchaser is not selected as the winning bidder, this Agreement will automatically terminate on the date the Bankruptcy Court enters an order approving the Alternative Transaction subject to 6.01 herein, provided, however, that, notwithstanding such termination, Purchaser shall be entitled to immediate payment of the Expense Reimbursement Fee pursuant to Section 6.01

10.2 _Effect of Termination_. Except as otherwise provided under this Section, upon the termination of this Agreement, all rights and obligations of Purchaser and Seller will terminate without any liability of one party to the other party, except for any liability of Purchaser or Seller for breach before termination. If the Purchaser defaults prior to termination of this Agreement, the Purchaser shall pay to Seller $10,000.00 as liquidated damages.

10.3 _Wavier_. No delay in exercising any right or remedy shall constitute a waiver thereof, and no waiver by Seller or Purchaser of the breach of any covenant of this Agreement shall be construed as a waiver of any proceeding or succeeding breach of the same or any other covenant or condition of this Agreement.

## ARTICLE XI.
## MISCELLANEOUS

11.01 _Assignability._ Seller may not assign this Agreement except pursuant to an order by the Bankruptcy Court or with the written consent of Purchaser. Purchaser may assign this Agreement and/or designate a nominee to take title to all or any part of the Assets or the operations of the Business at Closing (whether by lease or management agreement or otherwise). As a condition precedent to any assignment by Purchaser, the assignee of such rights shall have executed a written agreement, the form of which shall be reasonably acceptable to Seller, by which such assignee agrees to be filly bound by the terms and conditions of this Agreement as if said assignee were the original signatory as Purchaser hereto. Any assignment of this Agreement shall be binding upon and inure to the benefit of the successor or assignee of Purchaser and shall act as a release of Purchaser of its obligations hereunder.

11.02 _Entire Agreement._ This Agreement shall constitute the entire contract between the Parties and may not be modified except in writing and signed by both Parties. All of the exhibits, schedules, and other appendices attached to this Agreement, or to be attached hereto subsequent to the Effective Date,

are incorporated herein by reference.

11.03 <u>Governing Law and Forum.</u> This Agreement shall be deemed to be an agreement under the laws of the State of Georgia and for all purposes shall be governed by and construed in accordance with the internal laws of said state. THE PARTIES AGREE THAT, IN THE EVENT EITHER SHALL BRING ANY ACTION OR PROCEEDING IN RESPECT OF ANY CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTION, WHETHER IN TORT OR CONTRACT, AT LAW OR IN EQUITY, SUCH ACTION OR PROCEEDING SHALL BE BROUGHT EXCLUSIVELY IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF TENNESSEE (THE "CHOSEN COURT") AND (A) IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE CHOSEN COURT; (B) WAIVES ANY OBJECTION TO LAYING VENUE IN ANY SUCH ACTION OR PROCEEDING IN THE CHOSEN COURT; (C) WAIVES ANY OBJECTION THAT THE CHOSEN COURT IS AN INCONVENIENT FORUM OR DOES NOT HAVE JURISDICTION OVER ANY PARTY HERETO; AND (D) AGREES THAT SERVICE OF PROCESS UPON SUCH PARTY IN ANY SUCH ACTION OR PROCEEDING SHALL BE EFFECTIVE IF NOTICE IS GIVEN IN ACCORDANCE WITH <u>SECTION 11.05</u> OF THIS AGREEMENT.

11.04 <u>Expenses.</u> Except to the extent Purchaser is entitled to the Expense Reimbursement Fee as set forth in <u>Section 6.01(b)</u>, Seller and Purchaser will bear their own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Transaction contemplated hereby.

11.05 <u>Notice.</u> Any notice, demand, waiver, or consent required or permitted hereunder • shall be in writing and shall be given by prepaid registered or certified mail, with return receipt requested, or by national overnight courier service, in each case postage or delivery charges prepaid and addressed as follows:

| | |
|---|---|
| If to Seller: | Phillips Brothers Machine Company, Inc.<br>Attn: Michael Phillips<br>1198 Shattuck Industrial Blvd.<br>Lafayette, GA 30728<br>Email: pbmco@phillipsbrothersmachine.com |
| With a copy to: | Farinash & Hayduk<br>Attn: Jerrold D. Farinash, Esq.<br>100 W ML King Blvd., Suite 816<br>Chattanooga, TN 37402<br>Email: jdf@fandhlawfirm.com |
| If to Purchaser: | Phillips Consolidated, LLC<br>Attn: Barnet Rogers<br>2950 East Philadelphia Street<br>Ontario, CA 91761<br>Email: barnet.rogers@myerspower.com |
| With a copy to: | Patrick, Beard, Schulman & Jacoway, P.C.<br>Attn: Cara Alday, Esq.<br>537 Market Street, Suite 202<br>Chattanooga, TN 37402 |

16

Email: calday@pbsjlaw.com

The date of any such notice and of service thereof shall be deemed to be upon receipt, or three (3) days after deposit in registered or certified mail, or one (1) day following deposit with an overnight courier as set forth above. Any party may change its address for the purpose of notice by giving written notice in accordance with the provisions of this Section 11.05 of the Agreement.

11.06 Section Headings. The article and section headings of this Agreement are for convenience of reference only and do not form a part hereof and do not in any way modify, interpret, or construe the intentions of the Parties hereto.

11.07 No Third Party Beneficiaries; No Assumption of Liabilities. Notwithstanding any provision contained in this Agreement or in any exhibit, scheduled appendix, or other document referred to in this Agreement, to the contrary, this Agreement is intended as and shall be deemed to be an agreement for the sale of the Assets and, except as expressly provided hererein, none of the provisions of this Agreement shall be deemed to create any obligation or liability of either Party hereto to any person or entity that is not a party to this Agreement, whether under a third-patty beneficiary theory, laws relating to transferee liabilities, or otherwise. Except as expressly provided herein, Purchaser shall not assume and shall not discharge or be liable for any debts, liabilities, or obligations of Seller, or Claims against Seller, whether known or unknown by Seller or Purchaser at any time.

11.08 Further Assurances. A Party hereto shall, at any time and from time to time after the Closing, execute and deliver, or cause to be executed and delivered, to the other Party or its designee, such further consents, approvals, conveyances, assignments, and other documents and instruments as any Party shall reasonably request in order to catty out any and all of the terms and provisions of this Agreement.

11.09 Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The signature of any Party hereto to a counterpart may be transmitted via facsimile or electronic mail and shall be considered an original, executed counterpart upon receipt by the other Party. Any such facsimile or electronic mail counterpart shall be considered to have the same binding legal effect as an original counterpart.

11.10 Binding Effect. This Agreement shall be binding upon and inure to the benefit of the Parties to this Agreement and their respective successors, heirs, assigns, and legal representatives.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement under seal as of the day and year fast above written.

SELLER:                                           PURCHASER:
PHILLIPS BROTHERS                                 PHILLIPS CONSOLIDATED, LLC
MACHINE COMPANY, INC.

By: _Randall F. Phillips_                         By: _Rutgj_
                                                  _BARNET ROGERS_
Title: _President_                                Title: _MEMBER_

**EXHIBIT 2.01**

<u>LIST OF ASSETS</u>

The Parties agree to work together, in good faith, to finalize this exhibit as soon as practicable
after the Effective Date.

19

**EXHIBIT 2.05**

<u>LIST OF EXCLUDED ASSETS</u>

The Parties agree to work together, in good faith, to finalize this exhibit as soon as practicable after the Effective Date.

**EXHIBIT 2.07**

<u>LIST OF ASSUMED CONTRACTS</u>

The Parties agree to work together, in good faith, to finalize this exhibit as soon as practicable after the Effective Date.

**EXHIBIT 7.02(c)**

<u>FORM OF BILL OF SALE</u>

The Parties agree to work together, in good faith, to finalize this exhibit as soon as practicable after the Effective Date.

**EXHIBIT 7.02(d)(i)**

FORM OF ASSIGNMENT OF ASSUMED CONTRACTS

The Parties agree to work together, in good faith, to finalize this exhibit as soon as practicable after the Effective Date.

**EXHIBIT 7.02(d)(ii)**

FORM OF ASSIGNMENT OF INTANGIBLE PERSONAL PROPERTY

The Parties agree to work together, in good faith, to finalize this exhibit as soon as practicable after the Effective Date.

24

**EXHIBIT 7.05(e)**

<u>UTILITY PREPAYMENTS</u>

The Parties agree to work together, in good faith, to finalize this exhibit as soon as practicable after the Effective Date.